IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| AUBURN UNIVERSITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO.  3:08cv796-CSC |
| | ) | (WO) |
| MIKE MOODY and | ) | |
| SIXFINGERYEAR.COM | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**[1]

## I. INTRODUCTION

Inspired by Oliver Goldsmith's poem, *The Deserted Village*,[2] John Harper founded

the town of Auburn in east Alabama in 1836.  *See* http://www.auburn.edu/administration/

univrel/au_auinfo.html.  Auburn University was established in 1856 and is now one of the

---

[1]  It is Fall in Alabama, and Fall means football which no person residing in Alabama can easily ignore.  FED. R. EVID. 201(b) requires that a "judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Thus, even though a number of "facts" about football in the State of Alabama generally were not presented during the evidentiary hearing, the court is comfortable judicially noticing these football facts which in this state are pervasive.  None of these noticed facts were essential to the decision by the court.  And, of course, the parties may ask the court for an opportunity to be heard about the propriety of any noticed facts.  FED. R. EVID. 201(e).

[2]  The lengthy poem begins with the stanza

> Sweet Auburn! loveliest village of the plain,
> Where health and plenty cheered the labouring swain, . . .

*The Deserted Village*, Oliver Goldsmith, published 1770.

oldest land-grant universities in the South.[3]

Auburn kicked off an auspicious year in 1892 when it admitted its first women students and organized its first football team.  Thereafter, on February 22, 1893, Auburn and the University of Alabama ("Alabama") met for the first time on the gridiron in a battle that has come to be known as the Iron Bowl.[4]  This historical event  prepared the field for the players presently before the court.

When Auburn lines up, they play as the Tigers[5] even though the school's battle cry is "War Eagle."[6]  *See* http://www.ocm.auburn.edu/welcome/aboutauburn.html.  According to

---

[3]  Auburn University was first established as the East Alabama Male College in 1856.  In 1872, it was renamed the Agricultural and Mechanical College of Alabama when it became the first land grant college in the South.  In 1899, the University became the Alabama Polytechnic Institute.  Finally, in 1960, the school's name was changed to Auburn University, "a title more in keeping with its location." http://www.ocm.auburn.edu/welcome/aboutauburn.html

[4]  The contest is called the Iron Bowl because for years, the series was played in Birmingham, Alabama, a center of iron and steel production.  Commonly espoused that it was neutral territory, in reality Birmingham was chosen to host the series because its stadium, Legion Field, was the largest in the state when the series recommenced in 1948.

[5]  Goldsmith also provided the inspiration for the University's nickname, Tigers, as his poem contains the line "Where crouching tigers wait their hapless prey."  *See* http://auburntigers.cstv.com/trads/ aub-trads-nickname.html
     However, to further confuse those keeping score, Auburn University named its golden eagle mascot "Tiger."  http://auburntigers.cstv.com/trads/aub-trads-uniquely.html

[6]  Susan Smith, Director of Auburn's Trademark Management and Licensing office, testified at the preliminary injunction hearing that the phrase "WAR EAGLE" has been the University's "battle cry" since the 1920s.  According to Smith, the War Eagle myth dates back to the Civil War when an eagle flew over a football game and fell dead on the field.  According to Wikipedia, however, the 'myth' was conceived by the editor of Auburn's collegiate newspaper, The *Plainsman* and published in 1960.

     [T]he most popular myth was originally published in 1960 in the Auburn Plainsman and was conceived by then-Editor Jim Phillips. Phillips told the story of the first time Auburn met Georgia on the football field in 1892 and centered the story around a fictional spectator who was a veteran of the Civil War.

                                                                                    (continued...)

2

Smith, Auburn's teams play in true and bright orange and blue uniforms.  Taking a page out of a playbook that suggests the best defense is a good offense, Auburn University secured valid, federally registered trademarks and service marks for AUBURN®, WAR EAGLE®, AUBURN UNIVERSITY®, and AUBURN TIGERS®.  The marks AUBURN® and WAR EAGLE® are at the center of the dispute before the court.

In the Iron Bowl, an intrastate rivalry that surpasses most others in the intensity and excitement engendered in their respective fans, Auburn and Alabama have met 72 times. Alabama currently leads the series with 38 wins over Auburn's 33.[7]  However, at least until the end of November 2008, Auburn has a six-game winning streak against the now surging Crimson Tide of Alabama.  To commemorate this atypical historical streak, Mike Moody ("Moody") created an orange six finger foam hand novelty souvenir.[8]  On each finger,

---

[6](...continued)

In the stands with him that day was a golden eagle the old soldier had found on a battlefield during the war. He had kept it as a pet for almost 30 years. According to the story, the eagle suddenly broke free and began majestically circling the playing field. As the eagle soared, Auburn began a steady march toward the Georgia end zone for a thrilling victory. Elated at their team's play and taking the bird's presence as an omen of success, Auburn students and fans began to yell "War Eagle" to spur on their team ("war eagle" was once the common term for golden eagles). At the game's end, the eagle took a sudden dive, crashed into the ground, and died, giving his spirit to the Auburn fans. The battle cry "War Eagle" lived on to become a symbol of the proud Auburn spirit.

http://en.wikipedia.org/wiki/War_Eagle. *See also* http://www.ocm.auburn.edu/welcome/traditions.html. *See also* http://www.ocm.auburn.edu/welcome/traditions.html.

[7] There was one tie in 1907.

[8]After Alabama succumbed to Auburn in the 2007 Iron Bowl, Auburn coach Tommy Tuberville ran off the field with six fingers extended in the air. *See* http://auburn.rivals.com/content.asp?CID=743491.  The hand gesture drew some criticism  when Tuberville made the gesture during a good will tour of the Middle

(continued...)

3

inscribed in blue lettering, is the year and score of the past six Iron Bowls.  For example, on one finger, written in blue, is 2002 and 17-7.  Across the pads of the palm of the hand is the word "AUBURN," also in blue lettering.  In the palm of the hand, in blue lettering is the number 6 and below the number are the words "and counting!! WAR EAGLE! sixfingeryear.com."  Moody sold his six finger orange foam hand on his Internet-based website, sixfingeryear.com until Auburn and its legal team called foul and interfered with his game plan.

Feeling perhaps like a quarterback sacked by his own team, Moody and sixfingeryear.com are now being sued by his  alma mater for trademark and service mark infringement, false designation and misrepresentation of origin, unfair competition, trademark dilution, and state law claims of deceptive trade practices.  *See* Compl. at 1. Auburn seeks declaratory, injunctive, and monetary relief.  The court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331, 2201 and 2202.

Called upon to referee the dispute, the court now has before it the plaintiff's motion for a preliminary injunction.  On October 23, 2008, this court held a hearing on the motion. Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to the United States Magistrate Judge conducting all proceedings in this case and ordering the entry

---

(...continued)

East in May 2008.  Doubtless, some Alabamians considered this unsportsmanlike conduct.  *See* http://www.usatoday.com/sports/college/football/sec/2008-05-28-auburn-tuberville-alabama_N.htm.

of final judgment.[9]  On October 30, 2008, upon consideration of the evidence before the court and the arguments of counsel, the court concluded that the plaintiff's motion for preliminary injunction was due to be granted and entered an order restraining and enjoining the defendants, Michael Moody and sixfingeryear.com, and their officers, agents, servants, and employees, and all persons acting in conjunction with the defendants or at their direction, from producing, manufacturing, marketing, distributing, selling or offering for sale, the unlicensed orange and blue six finger foam hand novelty souvenirs bearing, or which have ever borne, the AUBURN® and WAR EAGLE® marks as well as any other foam hand novelty product that contains any of Auburn's marks including AUBURN®, WAR EAGLE®, AUBURN UNIVERSITY®, and AUBURN TIGERS® until further order of the court.  In that order, the court indicated that it would issue a separate memorandum opinion more fully explaining the court's findings and reasoning.  This is that opinion.

## II.  DISCUSSION

In general, Auburn seeks preliminary injunctive relief (1) to prohibit Moody and sixfingeryear.com from marketing, distributing and selling unlicensed six finger foam hands bearing Auburn's trademarks and service marks, (2) to compel Moody to "deliver up to Auburn for destruction" his remaining inventory of six finger foam hands as well as any

---

[9]  At the hearing on the motion for a preliminary injunction, Moody testified that he "was sixfingeryear.com" and that he alone was responsible for the creation and maintenance of the website.  The United States Magistrate Judge explained to Moody that this case was assigned to a Magistrate Judge and he had the right to consent or request reassignment.  By submitting the requisite form, the parties have consented to the Magistrate Judge's jurisdiction.  *See* 28 U.S.C. § 636(c).

5

promotional material, signs, and business cards that contain Auburn's marks,[10] and (3) to remove from the website any reference to any products containing Auburn's marks. *See* Compl. at 14-15.

To prevail on its motion for a preliminary injunction, Auburn has the burden of demonstrating the following:

> (1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest.

*North Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1217 (11th Cir. 2008) *quoting Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246-47 (11th Cir. 2002). *See also Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1097 (11th Cir. 2004) *quoting Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (*en banc*) (per curiam). "[A] preliminary injunction is an extraordinary and drastic remedy not be granted unless the movant clearly established the 'burden of persuasion' as to each of the four prerequisites. *Siegel*, 234 F.3d at 1176. With these principles in mind, the court will now determine whether a preliminary injunction is appropriate and should issue.

**A. Substantial likelihood of success on the merits.** The first question the court must answer is whether Auburn has demonstrated a likelihood of success on the merits. This

---

[10] In the preliminary injunction, the court ordered Moody to deliver to Auburn all of the unlicensed foam hands and other materials bearing the Auburn marks. Rather than permit destruction of these items at this juncture, the court ordered Auburn to preserve the items pending further order of the court.

enquiry must proceed in two parts because of the nature of the claims against the defendants. Auburn contends that Moody and sixfingeryear.com have infringed on its trademarks and service marks of AUBURN® and WAR EAGLE®. The registration and ownership of trade and service marks for use in commerce are governed by the Lanham Trademark Act, 15 U.S.C. §§ 1051 - 1127. "Trademarks are "any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [one's] goods . . . from those manufactured or sold by others and to indicate the source of the goods." *Gift of Learning Found., Inc., v. TGC, Inc.*, 329 F.3d 792, 797 (11th Cir. 2003).

A defendant is liable for trademark infringement under the Lanham Act if, without the consent of the registrant, he uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" which "is likely to cause confusion, or to cause mistake, or to deceive."[11] *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007); *Univ. of Fla. v. KPB, Inc.*, 89 F.3d 773, 776 (11th Cir. 1996); *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1529

---

[11]  15 U.S.C. § 1114(1)(a) (2006) provides in pertinent part as follows.

(1)  Any person who shall, without the consent of the registrant –

> (a)   use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive. . .

shall be liable in a civil action by the registrant for the remedies provided hereinafter provided.

(11th Cir. 1985); *Frehling Enters., Inc., v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).  Thus, Auburn must demonstrate both the use of the marks "in commerce" and likelihood of confusion regarding the use of the marks.  More specifically, to establish a trademark infringement, Auburn University

> must establish:  (1) that [it] possess[es] a valid mark, (2) that the defendants used the mark, (3) that the defendants' use of the mark occurred "in commerce," (4) that the defendants used the mark "in connection with the sale  . . . or advertising of any goods," and (5) that the defendants used the mark in a manner likely to confuse consumers.

*North Am. Med. Corp.*, 522 F.3d at 1218.  *See also Gift of Learning Found., Inc.*, 329 F.3d at 797; *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300-01 (11th Cir. 2001).

It is undisputed that Auburn University has valid, federally registered trademarks and service marks for AUBURN[®], WAR EAGLE[®], AUBURN UNIVERSITY[®], and AUBURN TIGERS[®].  During the preliminary injunction hearing, Moody scrambled to argue that he "feels" that Auburn should not have been permitted to register AUBURN[®] and  WAR EAGLE[®] as marks because of the common usage of these words.  For example, Moody felt that the word "AUBURN" was inextricably linked to the name of the City of Auburn while the phrase "WAR EAGLE" is synonymous with "hello" for Auburn fans.  Although some Auburn fans may use "WAR EAGLE" as a greeting, in common parlance, it is simply not a synonym for hello.

More to the point, however, Moody's feelings aside, he cannot collaterally attack the validity of the trademarks or service marks in this proceeding.  At the preliminary injunction

hearing, the plaintiff introduced the certificates of registration for each mark.

> A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate.

15 U.S.C. § 1112(b).

"[T]he right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable." 15 U.S.C. § 1065.  The plaintiff presented evidence at the hearing that it has maintained and used the registered marks for five years.[12]  The defendants presented no evidence to contest the validity of the registered marks.  Consequently, at this juncture, the validity of the marks is rendered incontestable.

The court now shifts the field of play to whether the defendants used Auburn's marks "in commerce" and "in connection with the sale . . . or advertising of goods."  *North Am. Med. Corp.*, 522 F.3d at 1218.

> In order for a mark to be "use[d] in commerce" the mark must be "placed in any manner on the goods or their containers or the

---

[12]  Auburn presented evidence of mark registrations for Auburn, registered Jan. 31, 2006, Auburn, registered April 22, 1997, Auburn, registered August 29. 2000, Auburn, registered March 18, 1997, Auburn registered February 25, 1997, War Eagle, registered April 3, 2007, War Eagle, registered January 28, 1997, War Eagle, registered February 25, 1997, and War Eagle, registered April 22, 1997.  (Pl's Exs. 1-9).

> displays associated therewith or on the tags or labels affixed thereto." *See* 15 U.S.C. § 1127.  If such an unauthorized "use" is shown by the plaintiff, the first prong of a trademark infringement action has been satisfied.  *See* 15 U.S.C. § 1114(1)(a); *Burger King* [*Corp. v. Mason*,] 710 F.2d [1480], 1491 [(11th Cir. 1983)].

*Optimum Techns., Inc.*, 496 F.3d at 1242.

When this litigation kicked off, Moody had on the front page of his website, sixfingeryear.com, two photographs of his six-finger foam hand and a photograph of a fan overlooking the Auburn end zone, holding up six fingers.[13]  (Pl's Ex. 22).  Although the words "AUBURN" and "WAR EAGLE" had been removed from the hands in the photographs, faint images of those marks remain visible.  (*Id*.)  Underneath the photographs is the phrase "WAR EAGLE" and an explanation of the "hand."  The explanation contains numerous underlined words which act as hyperlinks to the webpage's shopping cart.  For example, by clicking on the word HAND or the phrase GET YOUR HAND AND GET READY FOR the "08" "SHOW OF HANDS", the shopping cart page opens and the user is able to purchase the "Auburn Fans Six Finger Foam Hand" for $10.00.  Moody ordered 100 hands containing the words "AUBURN" and "WAR EAGLE" to sell on his website.  Moody testified that he sold only14 hands to friends and relatives for $10 each or two for $15.00; he testified that he gave most of them away. Unfortunately for Moody, he fumbled when he

---

[13]  Also on the front page of the website is a photograph of a hand prominently displaying a single finger which Moody concedes is not intended to suggest that Auburn is "#1" but rather is intended to "shoot the bird."  However, it was not clear at the hearing whether Moody's extended finger was directed at Alabama fans or his alma mater.

sold one of the hands containing the words "AUBURN" and "WAR EAGLE" to an employee of the Auburn's Trademark Management and Licensing Office.  Moreover, he sold the hand after he had received a cease and desist letter from the plaintiff's licensing agent.

Attempting to escape the plain language of the statute, Moody tried an end run arguing that he was not profiting from the sale of the hands and that he had not intended to use the marks in retail commerce.  According to Moody, he only wanted to learn how to build a website and that his foam hand was really more like "a lemonade stand type project."  His goal was to have "fun to celebrate and hopefully, make enough money to pay the costs and buy some beer."[14]  Moody also admitted that he still wants to sell the six finger foam hand and that he can make the hand without the AUBURN® and WAR EAGLE® marks.  Of course, Moody candidly conceded that, at this point in the season, the economic viability of such a product is not very good due to Auburn's disheartening season.[15]  According to Moody, it was "not very likely that he would reinvest" in any other version of the hand that did not contain the offending marks because he is not sure that he would be able to sell them. In light of Moody's testimony, the court has no difficulty concluding that the defendants used the plaintiff's marks AUBURN® and WAR EAGLE® in commerce in connection with the

---

[14]  Moody bemoaned the fact that he did not make enough money to buy beer, but he did have fun.

[15]  Auburn University's football team went to the spread offense this year which has turned out to be a wholly unsuccessful offensive strategy.  After only four games and dismal performances on offense, Auburn fired its new offense coordinator.  As of the date of this opinion, Auburn's win-loss record is a disappointing 4-5.

The University of Alabama Crimson Tide, on the other hand, is undefeated, leading the West Division of the Southeastern Conference, and is presently the number one ranked team in the country, leading in every poll.

sale of the six finger foam hand.

The court turns to the critical element of an infringement claim – the likelihood of confusion. "[I]nfringement turns on whether a likelihood of confusion exists." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1206 (11th Cir. 2008). The court looks to seven relevant factors when determining whether a likelihood of confusion exists between two trade or service marks:

> (1)  the type of mark at issue, (2) the similarity of design between the two marks, (3) the similarity of product, (4) the identity of retail outlets and purchasers, (5) the identity of advertising media utilized, (6) the defendant's intent, and (7) actual confusion between the two marks.

*Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1542 (11th Cir. 1985). *See also North Am. Med. Corp.*, 522 F.3d at 1220 *quoting Alliance Metals, Inc. of Atlanta v. Hinely Indus., Inc.*, 222 F.3d 895, 907 (11th Cir. 2000); *Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197, 1207 (11th Cir. 2004). "Of these, the type of mark and the evidence of actual confusion are the most important." *Frehling*, 192 F.3d at 1335.

The first factor the court examines is the type of mark and its strength.

> Classifying the type of mark Plaintiff has determines whether it is strong or weak. *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 973 (11th Cir. 1983). The stronger the mark, the greater the scope of protection accorded it, the weaker the mark, the less trademark protection it receives. *See id.* at 973. There are four categories of marks: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary. *See Freedom Sav. & Loan Ass'n Way*, 757 F.2d 1176, 1182 (11th Cir.), *cert. denied*, 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985). The categories are based on the relationship between the name and the service

or good it describes.

*Frehling*, 192 F.3d at 1335.

In *Univ. of Ga. Athletic Ass'n v. Laite*, the court concluded that the English bulldog symbol chosen as the University of Georgia's mascot was "at best, 'suggestive,' if not downright 'arbitrary.'" 756 F.2d at 1541.  The same rationale applies with equal force to Auburn University's selection of "War Eagle" as its battle cry.[16]  In addition, marks are considered arbitrary when the words "bear[] no relationship to the product." *Frehling*, 192 F.3d at 1335. The two marks used by Moody are AUBURN® and WAR EAGLE®.  Without question, the mark WAR EAGLE® is completely arbitrary; the only extant relationship is mythical.  The mark AUBURN® does have a geographic relationship to the City of Auburn where the University is located, so at worst it is suggestive if not arbitrary.

"[T]he widespread use of a mark by licensees would tend to support, rather than rebut, the proposition that [the] mark is a strong one."  *Univ. of Ga. Athletic Ass'n*, 756 F.2d at 1545.  Also important to the strength of the mark is "the degree to which third parties make use of the mark.  The less that third parties use the mark, the stronger it is, and the more protection it deserves." *Frehling*, 192 F.3d at 1336 (citations omitted).  Auburn University presented evidence that its almost 600 licensees use the marks on products such as t-shirts, jackets, headwear, jerseys, onesies, sleepwear, beachwear, sportswear, cheerleader uniforms, lingerie, socks, ties, mittens, jewelry, money clips, eyewear, luggage, shoelaces, umbrellas,

---

[16] *See* fn. 1, *supra.*

13

suspenders, trashcans, housewares, nightlights, frames, stemware, flatware, collectibles, signs, novelties, tattoos (removable) and, of course, shakers and foam hands. *See* Pl's Ex. 11. Based on the evidence, the court concludes that the plaintiff's marks of AUBURN® and WAR EAGLE® are strong marks within the two highest categories of scope of protection. Consequently, the first factor, strength of the marks, weighs heavily in favor of Auburn University.

The second factor requires the court to examine the similarity of the marks. "[T]he court compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling*, 192 F.3d at 1337; *E. Remy Martin & Co.*, 756 F.2d at 1531. Moody used the words "AUBURN" and "WAR EAGLE" on his six finger hand. The words are in the capital letters and appear in blue on the orange hand.[17] The plaintiff licenses an orange foam hand using the marks WAR EAGLE® and the interlocking AU®. While Moody does not use the interlocking AU® mark on his hand, the words he does use, "AUBURN" and "WAR EAGLE", are identical to the plaintiff's marks. "[T]he closer the marks are, the more likely reasonable consumers will mistake the source of the product that each mark represents. The probability of this potential confusion is the touchstone." *Frehling*, 192 F.3d at 1337. The court concludes that the second factor, similarity of the marks, weighs strongly in favor of the plaintiff.

Next, the court turns to the third factor, the similarity of the goods. Auburn University

---

[17] While the court cannot definitely say that Moody used the colors orange PMS 172 & blue PMS 289 as described by Smith, the colors on his six finger hand certainly fall within the hash marks.

licenses an orange foam hand which admittedly has only has five fingers, unlike Moody's six finger hand. Auburn's foam hand forms a fist with the index finger extended, presumably to signify that Auburn is "#1."[18] While Auburn's foam hand prominently displays the WAR EAGLE® mark on the finger, the phrase "WAR EAGLE" is placed at the bottom of the palm of Moody's hand. The placement of the mark does not score any points for Moody, however. Both hands are orange and blue and contain the words "WAR EAGLE." The similarity of the marks are "the sort of high degree . . . that portends a likelihood of consumer confusion." *Id.* The court concludes that this factor also weighs in favor of the plaintiff.

The fourth factor requires the court to examine the similarity of the parties' customers and trade channels. Given the nature of the products at issue, the court is confident that only Auburn University fans would be interested in either Auburn's hand or Moody's six finger hand. Consequently, the customer base is identical.[19] *See E. Remy Martin & Co.*, 756 F.2d at 1532.

Auburn sells its licensed products, including its orange foam hands, on the Internet and uses licensed vendors including the University's bookstore. Moody also sells his six finger hand using the Internet. Prior to the preliminary injunction hearing, Moody had on his website sixfingeryear.com, photographs of Auburn football players and its head football coach in which Moody's six-finger foam hand was prominently displayed. On the shopping

---

[18]   As previously noted, on the sixfingeryear.com website, Moody has a photograph of his hand "shooting a bird" which, needless to say, is suggestive of something else entirely.

[19]   Moody conceded that only Auburn fans would be interested in his hand.

cart page of the website, Moody advertises his six finger foam hand to "Auburn fans."  With references on the website to Auburn's marks, Moody clearly used those marks to "promote and advertise [his] products on the Internet.  Under the plain meaning of the statute, such use constitutes a use in commerce in connection with the advertising of any goods."  *North Am. Med. Corp.*, 522 F.3d at 1219.

The court recognizes that Auburn's licensed hands are not identical to Moody's unlicensed hands.  However, the differences between the hands are not sufficient to shift this factor to Moody's side.  "While compositional differences matter, they are not dispositive; we focus, rather, on the reasonable belief of the average consumer as to what the likely source of the goods was."  *Frehling*, 192 F.3d at 1338.

The court looks at whether the "the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties."  *Id*.  Because Auburn has almost 600 licensed vendors, it is not unreasonable to conclude that Auburn fans would confuse that both hands are marketed by Auburn University, and that Moody is simply another licensed vendor of the University, particularly when he uses the school's football coach and players to advertise his product.  *Id*. ("not unreasonable to fathom that the goods emanate from the same source.") Auburn scores with this factor.

Neither party presented any evidence related to the fifth factor, the similarity of advertising media.  "This factor looks to each party's method of advertising."  *Id.*, at 1339.

16

Consequently, this factor remains in the neutral zone.

The defendant's intent constitutes the sixth factor.  Moody testified that he began the website as "an interesting project to learn how to do a website."  He likened his website to a "lemonade stand" to commemorate "the historical event" of Auburn's six victories over Alabama.  Moody makes no forward progress with this argument.  "If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity."  *Frehling*, 192 F.3d at 1340.  In fact, Moody's own testimony throws his cause for a loss.  Moody testified that he is "selling a product that is designed to capture the imagination and enthusiasm of Auburn fans;" that he wanted to "hopefully, make enough money to pay the cost and buy some beer;" and finally, that he still wants to sell the six finger foam hand, although at this point in the season, a version of the hand without the words "AUBURN" or "WAR EAGLE" may not be "economically viable."  In light of his testimony, the court concludes that Moody began his venture clearly intending to derive a benefit from his anticipated success of the Auburn Tigers and the use of Auburn's marks.

In his response to the plaintiff's motion for a preliminary injunction, Moody argues that he "made no profit from the site, and . . . [has] in fact . . .  lost money."  (Res. in Opp. to Mot. for Preliminary Inj., doc. # 9 at 1).  It is not necessary that Moody have made a profit from the sale of the hand, only that he intended to benefit from the use of the plaintiff's marks.  The sixth factor also weighs strongly in favor of the plaintiff.

Finally, the court examines the seventh factor of actual confusion.  "It is undisputed that evidence of actual confusion is the best evidence of a likelihood of confusion." *Frehling*, 192 F.3d at 1340.  However, "evidence of *actual* confusion between trademarks is not necessary to a finding of *likelihood* of confusion."  *E. Remy Martin & Co.,* 756 F.2d at 1529.  Moreover, "'confusion' need not relate to the origin of the challenged *product*. Rather, "confusion" may relate to the public's knowledge that the *trademark*, which is "the triggering mechanism" for the sale of the product, originates with the plaintiff."  *Univ. of Ga. Athletic Ass'n*, 756 F.2d  at 1546.  In order words, confusion can occur when it appears that the owner of the marks, in this case, Auburn University, sponsored Moody's use of its marks. *Id*. at 1546 n. 28.  Because Moody used photographs of Auburn's coach and football players on his website to advertise his six finger hand, it is not unreasonable to conclude that Auburn fans would be confused about whether Moody was licensed to use Auburn's trademarks. This final factor weighs in favor of Auburn.

In addition to considering the seven factors, the court has considered Moody's website and the other evidence as a whole.  The website as it existed at the time of the hearing and before that date leaves little doubt that Moody intended to benefit from use of the words "AUBURN" and "WAR EAGLE."  Save one, all of the factors weigh in favor of Auburn. The court concludes that Auburn has made a strong showing of likelihood of success on the merits of its infringement claims against Moody.

**B.  Irreparable harm**.  The next question for the court is whether Auburn has

18

demonstrated that it will suffer irreparable harm in the absence of an injunction.  While the law in this circuit is well established that there exists "a presumption of irreparable harm once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim," *North Am. Med. Corp.*, 522 F.3d at 1227, the court does not rely only on the presumption to conclude that Auburn will suffer irreparable harm in the absence of an injunction.  *See eBay, Inc.v Mercexchange, L.L.C.*, 547 U.S. 388, 393-94 (2006).  Even after Moody received cease and desist letters from Auburn University, he continued to sell his unlicensed foam hands on the Internet.  In fact, Moody sold one of his hands containing Auburn's marks to an employee of Auburn's Trademark Management and Licensing office.  Licensed vendors pay royalties to Auburn which, in turn, pay for student scholarships, and while it is correct that  Auburn could be compensated for the loss of royalties with monetary damages, that does not show the injury is reparable.

> However, "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill. Irreparable injury can also be based upon the possibility of confusion." *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir.1998) (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 196 (3d Cir.1990) (holding that the lack of control over one's mark "creates the *potential* for damage to ... reputation[, which] constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case.")); *Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.,* 754 F.2d 91, 95 (2d Cir.1985) (holding that irreparable injury "exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial."). "[T]he most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another." *Int'l Kennel Club of Chicago, Inc. v. Mighty*

*Star, Inc.,* 846 F.2d 1079, 1092 (7th Cir.1988) (citation omitted). A plaintiff need not show that the infringer acted in such a way as to damage the reputation of the plaintiff. It is the loss of control of one's reputation by the adoption of a confusingly similar mark that supplies the substantial threat of irreparable harm.

*Ferrellgas Partners, L.P. v. Barrow*, 143 Fed. Appx. 180, 190-91 (11th Cir. 2005).

By permitting unlicensed vendors to sell products containing Auburn's marks, Auburn loses control of its reputation, dilutes its marks and weakens its brand. The court concludes that the plaintiff has demonstrated that the threat of irreparable harm to Auburn exists without the issuance of an injunction.

**C. Balancing the harm**. Balancing the harm between Auburn and Moody, Auburn has met its burden of demonstrating that the threatened harm to its reputation and good will outweighs any harm to Moody. Moody testified that he created sixfingeryear.com to "learn how to do a website." Preventing Moody from selling unlicensed foam hands on that site does not interfere with his ability to continue to learn how to improve his website design skills, particularly in light of his testimony that he is "not in the business of selling." In addition, Moody testified that he has only sold 14 foam hands to friends and family. Thus, Moody would suffer only minimal economic harm. Auburn, on the other hand, has a substantial interest in maintaining control over its marks, reputation and good will. Consequently, the court concludes that the harm suffered by the plaintiff would exceed the harm suffered by the defendants.

**D. Interest of the Public.** Finally, the court has no trouble concluding that the public

will not be disserved by the issuance of the injunction.  Moody points to no reason why the issuance of an injunction would be a disservice to the public.  Issuance of the injunction will protect Auburn's marks, reputation and good will.  Most importantly, however, the public has an interest in avoiding confusion with licensed and unlicensed products.  Thus, the court concludes that the issuance of an injunction will not disserve the public interest.

Moody is clearly offsides in this scrimmage.  The court has carefully reviewed the plaintiff's motion and the evidence presented at the hearing and concludes that the plaintiff has demonstrated that it meets each of the prerequisites for the issuance of a preliminary injunction.

> [A] preliminary injunctive decree . . . is sometimes an act of kindness to the party enjoined.  It cuts him off from a business life which, from all portends, would involve a series of trademark frustrations.

*E. Remy Martin & Co.*, 756 F.2d at 1534.

### III.  CONCLUSION

The plaintiff holds valid, federally registered trademarks and service marks for AUBURN®, WAR EAGLE®, AUBURN UNIVERSITY®, and AUBURN TIGERS®. Any product bearing these marks must be approved by Auburn University and licensed for sale or distribution.  The court finds that after being duly notified of the plaintiff's trademarks, services marks and licensing requirements, the defendants infringed upon and will continue to infringe upon the plaintiff's marks by offering for sale and selling unlicensed orange and blue six finger foam hand novelty souvenirs bearing those marks unless enjoined by this

Court.[20]  Consequently, the court concludes that the plaintiff has demonstrated a substantial

likelihood of success on the merits, that the threat of irreparable injury exists, that the harm

suffered by the plaintiff would exceed the harm suffered by the defendants, and that it is in

the best interest of the public not to be deceived or confused by any unauthorized use of

Auburn's trademarks and service marks by the defendants.  Thus, the court will enjoin and

restrain Moody[21] and sixfingeryear.com from producing, manufacturing, marketing,

distributing, and selling the unlicensed six finger foam hands the subject of this litigation and

any other foam hand novelty product that contains any of Auburn's marks including

AUBURN®, WAR EAGLE®, AUBURN UNIVERSITY®, and AUBURN TIGERS®.

Done this 4th day of November, 2008.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE

---

[20]  The court need not determine, at this juncture, whether to grant Auburn a preliminary injunction under its' state law trademark dilution, unfair competition, and Deceptive Trade Practices claims in light of the court's conclusions regarding a preliminary injunction under the Lanham Act.  *See E. Remy Martin & Co.*, 756 F.2d at 1534.

[21]  At this juncture, Mr. Moody may well feel like the first four lines of the second stanza of Goldsmith's *The Deserted Village*.

> Sweet smiling village, loveliest of the lawn,
> Thy sports are fled, and all thy charms withdrawn;
> Amidst thy bowers the tyrant's hand is seen,
> And desolation saddens all thy green;

*The Deserted Village*, Oliver Goldsmith, published 1770.